

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| MACKENZIE SHERIDAN, | ) | |
| | ) | |
| Appellant, | ) | WD76046 Consolidated with |
| | ) | WD76387 and WD76388 |
| v. | ) | |
| | ) | OPINION FILED:  March 25, 2014 |
| DIVISION OF EMPLOYMENT SECURITY, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

### Appeal from the Labor and Industrial Relations Commission

Before Division Two:  Gary D. Witt, Presiding Judge, Lisa White Hardwick, Judge and
Alok Ahuja, Judge

This consolidated appeal concerns Appellant Mackenzie Sheridan-Kautzi's ("Sheridan-Kautzi")[1] eligibility for unemployment benefits.  The Labor and Industrial Relations Commission ("Commission") determined that benefits for the six weeks after Sheridan-Kautzi gave birth were awarded in error on the ground that Sheridan-Kautzi was "unable to work."  We reverse and remand.

---

[1] Although the appellant is referred to simply as "Mackenzie Sheridan" in the style of the case, the parties refer to her as "Mackenzie Sheridan-Kautzi" and we follow that convention.

## FACTUAL AND PROCEDURAL HISTORY

Sheridan-Kautzi worked for Jordan Hotel Investments d/b/a Crowne Plaza Hotel ("Employer") in Kansas City as a sales manager from May 21, 2012 until she was discharged on July 6, 2012. Sheridan-Kautzi gave birth to a child on July 25, 2012.

On July 6, 2012, the day she was discharged, Sheridan-Kautzi filed an application for unemployment benefits. Employer protested that claim, alleging that Sheridan-Kautzi was discharged for misconduct. A deputy with the Division of Employment Security ("Division") determined that Sheridan-Kautzi was not disqualified from receiving benefits. Employer appealed this decision to the Appeals Tribunal.

The Appeals Tribunal set the appeal for hearing. The notice establishing the parameters for the hearing stated: "Evidence will be taken regarding the separation from work. The Decision will determine if the claimant left work voluntarily without good cause attributable to work or was discharged for misconduct connected with the work."

An in-person hearing was held and included testimony about the circumstances surrounding Sheridan-Kautzi's separation from work. The referee also asked Sheridan-Kautzi regarding whether she told the Division that she was able and available for work the week she gave birth to her child. The referee *sua sponte* entered into the record an exhibit where Sheridan-Kautzi had indicated she was able and available for work the week ending July 28, 2012, despite having given birth on July 25, 2012. The referee elicited from Sheridan-Kautzi that she was in the hospital for two days following the birth and asked why she indicated she was able to work the week ending July 28, 2012.

2

Sheridan-Kautzi replied in part that "[w]e just kept reporting it weekly as instructed. I guess I didn't think that because I was giving birth that I should not have done that."

The Appeals Tribunal issued its decision affirming the deputy's finding that Sheridan-Kautzi was NOT disqualified from the receipt of benefits as a result of misconduct connected with work. However, the decision also noted that Sheridan-Kautzi had reported as available for work the week following childbirth. The Appeals Tribunal remanded the case with directions that the deputy investigate Sheridan-Kautzi's ability and availability to work following the birth because she had been hospitalized July 25, 2012 for two days and received unemployment benefits for the week ending July 28, 2012. The referee's decision stated in part that the "claimant misrepresented information to the Division in order to receive unemployment insurance benefits for that week." The remand instruction was "for investigation and determination concerning the claimant's ability to work and availability to work on and after July 22, 2012, her ability to work during the ten weeks after the birth of her child, whether the claimant was overpaid benefits during that period, and whether any such overpayment was a result of fraud."

On October 31, 2012, Sheridan-Kautzi filed an application for review with the Commission, challenging the Appeal Tribunal's *sua sponte* inquiry into her ability and availability to work as the mother of a baby as well as the Tribunal's order remanding the case for a deputy's investigation. She sought review on statutory, due process, and equal protection grounds. The Commission determined that the "Appeals Tribunal did not decide this separate issue, but only ordered that it be investigated and determined" and

3

therefore that Sheridan-Kautzi had not yet been aggrieved by an adverse decision on the matter.

However, the Commission's decision also noted an additional agency action: on October 23, 2012, a deputy issued a determination in accordance with the Appeals Tribunal's remand order. That determination stated that Sheridan-Kautzi was "ineligible for benefits from July 22, 2012, through September 8, 2012, on a finding that claimant was not able to work that period." If there was a hearing conducted prior to the entry of this determination, neither party cited its location in the record and it is somewhat unclear on which evidence the deputy relied in reaching this conclusion. The deputy's determination assessed an overpayment against Sheridan-Kautzi in the amount of $2,240 for those six weeks. Nevertheless, in light of that deputy's determination, the Commission's decision stated that the "records do not indicate that claimant has filed an appeal from that determination" but "directed the Division to consider claimant's October 31, 2012, communication as a timely appeal."

Sheridan-Kautzi appealed that decision from the Commission to this court in Case No. WD76046.

Meanwhile, because the Commission had ordered Sheridan-Kautzi's application for review to be treated as a timely appeal of the deputy's decisions regarding unavailability/inability to work and overpayment, the Appeals Tribunal held an in-person hearing on these issues. The sole witness at that hearing was Sheridan-Kautzi, who testified that she was willing and able to work in the days following the birth. Sheridan-Kautzi testified about her pregnancy, her childbirth, and her physical health. Sheridan-

4

Kautzi was under doctor's care until the birth of her son and was able to work while under that care until her termination. She had a normal birth "with no complications so a six-week check-up is typically normal to ensure . . . the healing process had taken course and it had." She had no need to see her doctor prior to the regularly scheduled appointment six weeks after birth. Sheridan-Kautzi was using a telephone and computer during that time frame. She was searching for "desk-bound" work before and immediately after childbirth and would have taken a job if offered one. She reached out to contacts within her industry of catering and hospitality sales, including prior employers. She was seeking full-time work and had lined up childcare arrangements prior to the baby's birth. She had transportation the entire time. She stated that no event rendered her "unavailable to accept work or to actually perform work." The only point at which Sheridan-Kautzi "paused" in her efforts to obtain work was the Wednesday that her son was born through that weekend. She kept records of all the employers that she reached out to until she eventually found employment. Sheridan-Kautzi testified that she could have returned to work July 30 and would have been "physically capable" of working. She would have gone back to work then because she had the "fear of not finding anything sooner than that" because she "had three children at home . . . family to support" and "certainly it would not have been ideal going back [to work] at two weeks or five days or even six weeks but I had a family." The job she ultimately obtained is "desk-bound," primarily involving use of a telephone and computer.

Because of her proceedings with the Division and at the request of an employee of the Division, Sheridan-Kautzi secured a written note from her doctor regarding her ability

5

to work, well after she had completed her six-week check-up. In its entirety, that handwritten note, which was dated October 19, 2012, stated: "Mackenzie Sheridan DOB 5/30/76 OK to return to work without restrictions Sept 5 2012." Sheridan-Kautzi's doctor never ordered her not to work for any period of time. The doctor never informed her of any restrictions that would have prevented her from working, making telephone sales calls or using a computer.

The Tribunal issued this determination:

[T]he claimant did not have complications with the delivery of her baby on July 25, 2012, and she believed that as of the following week, she was physically able to perform the type of work that she was seeking. However, the claimant was not subsequently seen by her doctor until six weeks later, and the only medical evidence offered during the hearing states she could return to work without restrictions on September 5, 2012. Therefore, it is concluded that the claimant is ineligible for benefits from July 22, 2012 to September 8, 2012, as she was not able to work as required for benefit entitlement during that period.

In addition to determining that Sheridan-Kautzi was "not able to work," the Appeals Tribunal did not find that she had committed fraud but affirmed the deputy's overpayment finding. The Commission affirmed and adopted the Appeals Tribunal's decision in both respects.

Sheridan-Kautzi then appealed to this court in WD76387 (inability/unavailability to work) and WD76388 (overpayment). We consolidated those two cases with the prior case WD76046 (*sua sponte* inquiry).

6

## STANDARD OF REVIEW

Review is governed by section 288.210,[2] which provides:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
> (1) That the commission acted without or in excess of its powers;
> (2) That the award was procured by fraud;
> (3) That the facts found by the commission do not support the award;
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

"A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223.

> Nothing requires this Court to review the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the Commission's decision. The whole record is considered to determine if there is sufficient competent and substantial evidence to support the Commission's award. A reviewing court considers whether the Commission could have reasonably made its findings, and reached its result, upon consideration of all the evidence before it.

> This Court defers to the Commission's factual findings and recognizes that it is the Commission's function to determine credibility of witnesses. This Court may not substitute its judgment on the evidence, and when the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding.

---

[2] All statutory references are to RSMo (2000) as currently supplemented unless indicated otherwise.

*Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012) (citations omitted).

"[W]e do not defer to the Commission's conclusions of law or its application of the law to the facts." *Evans v. Div. of Emp't. Sec.*, 354 S.W.3d 220, 223 (Mo. App. W.D. 2011). Additionally, where, as here, the Commission adopts the decision of the Appeals Tribunal, we consider the Tribunal's decision to be the Commission's for purposes of our review. *Ashford v. Div. of Emp't. Sec*., 355 S.W.3d 538, 541 (Mo. App. W.D. 2011) (citation omitted).

## ANALYSIS

Sheridan-Kautzi asserts three points of error in the Commission's decision. In her first point, Sheridan-Kautzi argues that the Commission acted without or in excess of its powers in that the Appeals Tribunal deprived her of a fair hearing by raising the ability and availability to work after childbirth *sua sponte,* without providing notice to her that this issue would be addressed at the hearing. In her second point, Sheridan-Kautzi argues that there was not sufficient competent evidence to warrant the decision relating to her ability to work in that the evidence demonstrates that she was able and available to work. In her third point, Sheridan-Kautzi argues that there was not sufficient competent evidence to warrant the decision assessing overpayment because the Appeals Tribunal's determination that she was ineligible for benefits is invalid due to error cited in her first and second points. For the reasons set forth below, Sheridan-Kautzi's second and third points are meritorious and dispositive of the appeal.

**Discussion**

The question posed in Points Two and Three is whether the Commission erred in affirming the Appeals Tribunal's decisions about ability to work and overpayment because there was not sufficient competent evidence to warrant the finding that Sheridan-Kautzi was unable to work solely due to childbirth. Sheridan-Kautzi appeals on the ground that it was error to find that she was "unable and unavailable" to work, yet the Commission's decision made no mention of her availability for work and hence our focus is only on her ability to work. To that end, Sheridan-Kautzi asserts that the Commission erred because the evidence demonstrates that she was able to work and there is no evidence to the contrary. We agree with Sheridan-Kautzi.

It is undisputed that Sheridan-Kautzi was "discharged" and no party to this appeal challenges the Commission's finding that her discharge was not due to misconduct on her part. Thus, the only issue before this court is whether the evidence and the law support the Commission's finding that she was ineligible for benefits because she was unable to work for the approximately six weeks following her childbirth and that an overpayment of benefits should be assessed against her.

Under section 288.040.1(2), eligibility for benefits is determined on a weekly basis. A claimant is eligible for benefits if he or she "is *able to work* and is available for work [and n]o person shall be deemed available for work unless such person has been and is actively and earnestly seeking work." § 288.040.1(2) (emphasis added).

The legislature's expression of policy in section 288.020 is our guide for judicial interpretation of Chapter 288:

1. As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to health, morals, and welfare of the people of this state resulting in a public calamity. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

2. This law shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment.

As such, statutory language denying an employee benefits unless he or she is "able to work" under section 288.040.1(2) must be construed in light of the policy expressed by the legislature in section 288.010. "Disqualifying provisions of the Act are strictly construed against disallowance of compensation." *Whitted v. Div. of Emp't. Sec.*, 306 S.W.3d 704, 706-07 (Mo. App. W.D. 2010) (quoting *Mo. Div. of Emp't. Sec. v. Labor & Indus. Rel. Comm'n*, 651 S.W.2d 145, 148 (Mo. banc 1983)). Similarly, "ineligibility provisions . . . are punitive in nature, resulting from a claimant's failure to actively engage in seeking work[,] and do not apply when a claimant is not available for work due to an unfortunate family emergency beyond her control." *Mo. Div. of Emp't. Sec. v. Jones*, 679 S.W.2d 413, 414 (Mo. App. E.D. 1984).

The expression "able to work" is not defined in section 288.040.1(2). Though usually in the context of an "available to work" determination, courts have held that the application of that provision "differs from case to case" and that "a claimant must clearly hold a genuine attachment to the labor market and be able, willing, and ready to accept

suitable work." *RPCS, Inc. v. Waters*, 190 S.W.3d 580, 588 (Mo. App. S.D. 2006) (quoting *Mo. Div. of Emp't. Sec. v. Labor & Indus. Rel. Comm'n*, 651 S.W.2d at 151) (additional citation omitted).

Understanding that the legislative directives mandate liberal construction of the Act, including careful consideration of ineligibility provisions, and that precedent indicates that the question of whether a claimant is "able to work" is an individualized determination, in reviewing the record as a whole, we do not see sufficient competent evidence to support the Commission's determination that Sheridan-Kautzi was unable to work for six weeks solely due to childbirth. The record is replete with Sheridan-Kautzi's uncontroverted testimony that she sought employment and was physically able to work during this period. *See Div. of Emp't. Sec. v. Labor & Indus. Rel. Comm'n*, 651 S.W.2d at 151. The Commission expressly credited at least some of Sheridan-Kautzi's testimony, since it found based on her testimony that her childbirth was without complications, resulted in a two-day hospital stay, and did not require follow-up care until her regularly scheduled six-week checkup. The Commission also expressly credited Sheridan-Kautzi's testimony that "she believed that as of the following week, she was physically able to perform the type of work that she was seeking." The decision does not find any portion of Sheridan-Kautzi's testimony not to be credible. In that testimony, she described in detail her ability and willingness to work, the arrangements she had made for transportation and child care so that she could work, and the efforts she undertook to find employment.

11

Despite Sheridan-Kautzi's testimony, on which the Commission explicitly relied, it nevertheless found that she had failed to satisfy her burden to prove that she was "able to work" during the weeks in question, because "the only medical evidence offered during the hearing states she could return to work without restrictions on September 5, 2012."[3] Given Sheridan-Kautzi's testimony, and the absence of any contrary evidence or any statement that the Commission disbelieved her testimony, we read the Commission's decision as holding that, to discharge her burden of proof, Sheridan-Kautzi could not rely solely on her own lay testimony; instead, she was required to present *medical evidence* of her ability to work following her childbirth. This conclusion is legally erroneous, and requires reversal.

Prior decisions hold that "[t]he determination of availability for work is largely a fact question for the Commission." *Eder v. Lawson's Hardwood Floors, Inc.*, 403 S.W.3d 623, 624 (Mo. App. S.D. 2012) (citation omitted). We have held that "it is not necessary nor desirable to attempt an inflexible definition" of a claimant's "ability" or "availability" for work, because the terms' "meaning will vary depending upon the peculiar facts in each case." *Wester v. Labor & Indus. Relations Comm'n*, 134 S.W.3d 757, 759 (Mo. App. S.D. 2004). While the inquiry may "differ[ ] from case to case," in order to be "able" and "available" for work "a claimant must clearly hold a genuine attachment to the labor market and be able, willing, and ready to accept suitable work." *RPCS*, 190 S.W.3d at 588.

---

[3] It should be noted that the doctor's note does not indicate that she was unable to work during this period of time but only indicates that she was able to return to work without some unspecified restriction. Without setting forth what this restriction may have entailed, there is no way to know whether the restriction would have hindered her ability to perform the positions for which she was seeking employment.

12

The question whether an unemployment benefits claimant is "able to work" for purposes of the Missouri Employment Security Law bears some similarity to the question whether an injured worker is "disabled" under the Worker's Compensation Law. *See*, *e.g.*, *Scott v. Treasurer of State*, 417 S.W.3d 381, 386-87 (Mo. App. W.D. 2014). In the context of disability determinations under the workers' compensation law, however, we have repeatedly held that medical evidence is *not* required to establish the existence or extent of an injured worker's disability; we have also made clear that the Commission is entitled to disregard a physician's testimony concerning a worker's degree of disability, even if that testimony is not contradicted. As we only recently explained:

> [W]hile it is true that the Commission may not reject uncontradicted medical testimony in favor of the ALJ's opinion on the issue of medical causation[,] the extent of an employee's disability, and thus employability, is a not an issue of medical causation, nor does it exclusively require medical testimony. The extent and percentage of disability is a finding of fact within the special province of the Industrial Commission. As a result, in determining the degree of a claimant's disability, the Commission may consider all the evidence and the reasonable inferences drawn from that evidence.

*Palmentere Bros. Cartage Serv. v. Wright*, 410 S.W.3d 685, 692 (Mo. App. W.D. 2013) (citations omitted).

We believe the same result should apply here: the determination of whether an unemployed worker is "able to work" does not exclusively require medical testimony, and must instead be based on all of the evidence concerning the worker's circumstances before the Commission. In particular, there is nothing so unusual or extraordinary about a normal childbirth, without medical complications or non-routine follow-up care, which requires that a medical professional pronounce the worker "able to work" before the

13

Commission can find that the worker is eligible for unemployment compensation. Yet in this case, the Commission determined that Sheridan-Kautzi had failed to prove that she was "able to work" for the sole reason that she had presented no *medical evidence* of her ability to work at any date prior to September 5, 2012. The Commission's basis for rejecting Sheridan-Kautzi's eligibility for benefits was legally erroneous. The Commission's decision could also have the perverse result of requiring unemployed women, who may not have health insurance coverage and who may be in challenging financial circumstances, to seek medical releases from physicians whom they otherwise have no reason to see. We are also troubled that the Commission's decision arguably could be read to create a special, more exacting burden of proof for female claimants following childbirth, despite the dictates of federal law that the States "cannot single out pregnancy for disadvantageous treatment" in administering their unemployment compensation laws. *Wimberly v. Labor & Indus. Relations Comm'n of Mo.*, 479 U.S. 511, 518 (1987); Federal Unemployment Tax Act ("FUTA"), 26 U.S.C. § 3304(a)(12) (specifying that "no person shall be denied compensation under such State law solely on the basis of pregnancy or termination of pregnancy").[4]

---

[4] In addition to FUTA, numerous state and federal laws protect against adverse employment decisions based on pregnancy. For example, under certain circumstances, an employee cannot be disqualified from receiving benefits if she was forced to leave her work because of pregnancy and attempted to return. § 288.050.1(1)(d). Also, the Pregnancy Discrimination Act ("PDA") of 1978 requires that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). To that end, our legislature has stated that the public policy of this state is to prohibit the termination of an employee or any other adverse employment action based on pregnancy. *Self v. Midwest Orthopedics Foot & Ankle, P.C.*, 272 S.W.3d 364, 369 (Mo. App. W.D. 2008) (noting that Missouri courts are guided by Missouri law and federal employment discrimination law, including the PDA, when interpreting the Missouri Human Rights Act). Further, eligible employees are entitled to take up to twelve work weeks of unpaid leave under the Family and Medical Leave Act of 1993, e.g. for birth of a son or daughter of the employee. 29 U.S.C. § 2612(a)(1)(A); *Nevada Dept. of Human Res.*

## Conclusion

Because the Commission erroneously held that Sheridan-Kautzi had failed to prove that she was "able to work" due to her failure to present *medical evidence* of that fact, and because the Commission otherwise credited her testimony, the Commission's decision is reversed, and the cause is remanded for the entry of an appropriate order, consistent with this opinion, awarding Sheridan-Kautzi unemployment compensation benefits and eliminating any finding of overpayment.

_____

Gary D. Witt, Judge

All concur

---

*v. Hibbs,* 538 U.S. 721, 736 (2003) (noting in the context of the FMLA that Congress recognized that sex discrimination is rooted primarily in stereotypes about "women when they are mothers or mothers-to-be").